I'm being pleased to report Philip Martin for Mr. Warmenhoven, who is the CEO of NetApp and was the actual driving force in the creation of the plan in 2005, which was to cover a retired executive. Between the time he retired and he got the Medicare. This is an unusual appeal for one reason, which is the two exercises that we have to confront here are both first year law school issues. Number one, how do you interpret a statute? And number two, how do you interpret a contract? Now, with all due respect to Judge Freeman's, you know, sterling legal education and her excellent training at Moses Last, who's a law firm in San Francisco. Chief loved them both. Let's start at the beginning. In 2005, as I said earlier, Warmenhoven asked the board and the compensation committee acting on behalf of the board to create a separate plan for senior executives of a certain age and years of service to cover them until they got the Medicare. It was for a lifetime. But again, the plan was to be then subservient to Medicare when the executive hit it. It was documented in a PowerPoint, which was repeated with slight changes six different times between 2005 and 2014. Seven executives eventually qualified and were vested in those. Nothing in the PowerPoints refers in any way, shape or form to the insurance certificate, something that Judge Freeman noted at page 66 of the transcript when they had the oral argument. So first we deal with the statute, then we'll deal with the contract. Counsel, forgive me for interrupting, but I think you're leaning back and forth. If you stay close to the microphone, I'll be able to hear you better, at least on my end. Not at all. I just don't want to miss anything. It describes who is going to be paid and how those benefits are to be administered. All of those requirements are contained in the first PowerPoint and in all the PowerPoints therein. Now, there's no dispute that the benefits were going to be obtained via the employer's policy for its employees. The employee benefit plan, which was first in place in 2005, took this responsibility to transition in 2013 to UnitedHealthcare. Of course, there's only one person in his wife's, actually two, that took advantage of the vested benefits granted them in 2005, Mr. Allen, when he retired. It wasn't for approximately seven years before the second executive retired, Mr. Domo, and started receiving the benefits. All of the individuals received the PowerPoints at the time they were eligible. None of the individuals received certificates of insurance saying, oh, by the way, the coverage really is limited here. Check out page 159 of the certificates. There was no reference, as I said before, to the certificates at all. Are you arguing that the PowerPoint slides created the plan, that they were the plan documents, or that they changed the terms of an existing plan? The PowerPoint slides are the plan documents. Yes, Your Honor, because they were created and called the executive medical retirement plan in May of 2005. How do we know that PowerPoint was not a summary plan description? Because it doesn't say, you look at anything else to get to the end point. And whether it's a summary plan description or not, Your Honor, it meets all requirements of Section 3. What else should one need if you have vested benefits? I know that's the issue, before you can make a claim for those benefits. The reason it matters is because we have case law that tells us what to do if there's a conflict between a summary plan description and a certificate. And I'm trying to figure out whether or not that case law is applicable here. You're familiar with the Pritchard case? Of course, but there's nothing in the summary plan description statutes that basically say this document, that is the PowerPoint documents, somehow is only a summary plan description, as opposed to meeting all the requirements of Section 3. So is it your contention then, maybe this is what you're arguing, your briefing kind of goes right past this, and in response to, I'm really just intending a response to Judge, or a follow-up to Judge Beatty's question. And that is that you don't think the PowerPoint, if I'm understanding correctly, it qualifies as a summary plan description, but rather it is part of the plan, or was the manifestation of the plan in total? Well, it's the manifestation of the plan, just like the Scott case and the other cases in which there's a written document that is not a summary plan description, but that was sufficient to confer benefits on the individuals. Hold on, forgive me for interrupting again, but just to be clear, you are now talking about the PowerPoint alone, divorced from the certificate, is that right? Of course. The certificates have nothing to do with the coverage at all, and I'll get to that in a minute, but I don't want to get to the 403 and 402 question unless you have questions, I would like to reserve three minutes and rebuttal if I may. What happened was, obviously, the certificates were issued that covered conditions involving the employee benefit plan. When the discussion comes to, well, look, there's termination language in those certificates, that must apply to the executive plan, there's absolutely no connection at all. For example, you look at the citations in the record, in this Hepler head, where they said, look at this part of the certificate where it says the plan can be terminated by the employer or the sponsor in the UHC case. You turn back one page from that, and you see the plan that you're talking about is called the group welfare benefit plan. That was what Cigna called it. UHC called it the welfare benefit plan. We asked for the welfare benefit plan in discovery. Let us see what this plan is, and does that cover the retired executives? Is there something we're missing? And what was the response? No, no, no, that just refers to the certificate. In other words, the certificate somehow morphed into this welfare benefit plan. But there are certificates that don't meet the requirements of a risk of Section 3 or 402 for very simple reasons. It doesn't define who the beneficiaries are and how they're determined. Remember, the PowerPoint said you've got to be 50. You've got to, you know, then age was two times the years there. It'd have to be over 65. So there was a specific requirement for individuals to be retained for a certain period of time. This was obviously something that was created to keep the most senior executives. You couldn't walk in and, you know, get retirement two years later and take advantage of this, which has led to the odd discussion about how somehow Section 402, 1102 of 29 USC, somehow governs here. And because the PowerPoints don't say how it can be amended or any, you know, who the fiduciary is, it doesn't count. But Scott saw this coming, the Ninth Circuit did, and then Blount, which is, look, the statute is going to be interpreted in a way to benefit employees. You can't have a situation where the bureaucrats and the HR department who are supposed to do the documentation of all this stuff doesn't do it, and then there's absolutely no claim under the law. That is just bizarre. Because let me posit what the argument would have been. Certificates clearly didn't meet the 402 requirements. They say expressly, we're not the fiduciary. There's no amendment section in there whatsoever. They don't describe how the benefits are going to be paid. So if it doesn't meet the 402 requirements, then where are we? There's no plan? So then did Mr. Whirlwind have the right to go to state court and sue for breach of contract because he'd been told for 11 years he would have lifetime benefits until Medicare upon retirement? That would just be bizarre. Because as you know, including Gulf, the employees who went into state court and tried to sue said, no, no, you're in the wrong place. This is an ERISA case. You've got to go to federal court and make your point, which is what we did. So it's just very odd that the 402 language got in there for one simple reason. All of the cases that discuss the 402 issue, every one of them, the Sinelli case, the Peixota case, and the mole case, all of them involved situations where the termination language or a mole surrogation language was included in a plan document. So it was complete dicta as to whether Section 3 applied, Section 402 applied. There was a termination provision that was part of the deal for, again, surrogation as involved. That does not exist. It didn't exist until 2016 when the plan was completely changed and you've got that in the record. Of course, by that time, you had seven people and their wives and children who were already vested, had been receiving benefits under the plan. So I talked about the certificates. I talked about the statute. And I don't know that there's much else to say, so I may wind up saving about four minutes on my rebuttal. Because virtually all of the key issues and evidence related to the first claim for benefits, there isn't a whole lot to say about the second alternative claim, which is misleading statements that give rise to a breach of fiduciary separate claim under the arrest of statute. The only odd thing that came out of Judge Freeman's order on the second claim was this idea that somehow, because these are senior executives, they have a different level of reasonableness than the normal employee did. They have the ability, because they're big deals in the company, to go searching through 160 paid certificates to find out if there's some termination language in there. It is absolutely undisputed. These people, all of them, including one of them, never got the certificates until they retired. And because, A, they weren't the plan, you know, all they did was list what your benefits are, same, obviously, as under the employee benefits. It would be completely normal for someone to get that and think nothing of it in terms of what impact it could have on the benefits. When all of the executives in NetApp were deposed, not one of them said, it was clear to us because we told them, and here's a piece of paper that we told them, that your benefits get in. 2016, everything changed. And the record showed there was a significant blowback by the executives in these meetings they had with the seniors, the CEO that wanted to terminate the plan. And they said, where did this come from? We've never been told this. And, oh, by the way, we've been disclosing to the public in the SEC filings that these were lifetime benefits. You've accrued $26 million to pay them. Where is this termination stuff coming from? So just as the judge said in the oral argument, there was no relation back, there was no reference by incorporation of any termination language in the certificates. And they certainly are not the plan. I'll reserve my remaining time. Thank you, counsel. We'll hear from opposing counsel. Thank you, Your Honor. May it please the court. Laurie Hepler for NetApp and the plan. Your Honors, the Pashata versus Teledyne case disposes of the argument appellant is making about his client having no responsibility to go and read documents that he absolutely knew existed, admitted under oath that he knew. Pashata versus Teledyne holds that even rank and file employees, not senior executives, even rank and file employees could not rely on a promise the company would pay medical premiums for life contained in insurance booklets because those booklets said the insurance contract controlled. And the reason they couldn't was that the contract was, quote, available for review by any employee who wished to see it, unquote. Therefore, the court held that the reservation of the company's termination right was effective. Not that an express reservation was required, frankly. Right. It doesn't really matter whether he ultimately read the termination provision in the certificates because the law says nonvesting is the rule under Arisa. The parties agree on this. It's in the opening brief. It's in the Curtis Wright case from the Supreme Court. It's in Sinelli from this court. It's black letter law under Arisa that nonvesting is the rule. So it was actually Mr. Wormenhoven's burden, not ours, to demonstrate an Arisa compliant document that committed, quote, clearly and expressly, unquote, that's the language in Sinelli, to relinquish the default right of the company to terminate this benefit at any time for any reason. That was his burden to prove. It was not our burden to show that we expressly reserved it anywhere. Now, your honors, the line of cases that affirm summary judgment or dismissal for plan sponsors or employers in circumstances, frankly, more disappointing to participants than these is long and compelling. The Curtis Wright case decided by the Supreme Court involved employees who relied for many years on a post-retirement health plan until the employer announced it would terminate those benefits for employees of any facility the company closed. The Supreme Court starkly held that the employer's decision to, quote, deprive respondents of health benefits is not a cognizable complaint under Arisa, unquote. Pashata versus Teledyne, again, the employees relied for 20 years on booklets from the insurer saying Teledyne would cover health premiums for the life of any retiree who had 15 or more years of service until the employer reduced the benefits. This Court affirmed summary judgment because the booklets didn't meet the statutory definition of a summary plan description. Mr. Warmanhoven seems, for lack of a better phrase, stuck in state contract law, as his argument sort of implied at the beginning. That's not the law controlling here, right? Federal Arisa law often reaches results that in individual cases could, by the plaintiff's plight, feel unfair, but that have systemic and good reasons rooted in the statutory scheme's need for predictability and the need to incentivize employers to offer benefit plans, which they wouldn't do if they didn't have the termination right when circumstances exactly like this case arose requiring a different business judgment. Cinelli, a case we rely on heavily, involved a promise of supplemental life insurance in a letter to the plaintiff from the company president and in a board resolution promise of supplemental life insurance far above what he would have had without that rider. A successor company canceled the benefit long after the plaintiff retired when he was too old to secure a new policy at any reasonable cost. This Court affirmed summary judgment on claims identical to Mr. Warmanhoven's, where the plan document, like here, contained clear termination language. The plan document was the certificates, Your Honors. I'm puzzled by the contention that the certificates have nothing to do with this. I'm prepared, if you would like, to go over the ways in which each certificate met each requirement under the controlling statute, which is Section 402 and not Section 3, or 29 U.S.C. 1102, not 1002. If the Court has any questions about how the certificates comply. But again, the PowerPoints were neither the formal plan document, nor even did they meet the criteria under Donovan, the case that Mr. Warmanhoven relies on, which, I mean, in a way, is a completely irrelevant analysis anyway, because Donovan and Scott are all about whether a plan exists, right? And the parties agree a plan exists. Right, but we are talking about what comprises the plan, hence my earlier question. Is it your position that the PowerPoint was a summary plan document? Your Honor, we don't regard it as a summary plan description. What is it? Well, it was an offer, it was a proposal by staff to the Compensation Committee. And Mr. Warmanhoven's own testimony explains this in 2, I believe it's 2 ER 213 to 214. Those PowerPoints shown to him, and by the way, all the other, whatever was shown to other plaintiffs is irrelevant, because there's no evidence he ever saw it. So let's talk about the PowerPoints shown to him that led to his promotion of this benefit plan that would benefit himself and other senior executives. May I stop you there? Is there more than one that applied to this plaintiff? No. Okay. The 2005 PowerPoint. While we're here, which PowerPoint, I just want to make sure we're looking at the right one pertaining to this plaintiff. Is that going to be confusing when I look back at the excerpts? I want to make sure I've got the right one here. Absolutely. And it is the one in the sealed volume, Your Honor, 15 ER 3638 to 3639. Thank you. Okay. So go right ahead. Sure. I'm describing to you what the heck the PowerPoint is. It was a proposal from staff, from the benefit staff of NetApp to the compensation committee of the board. And the testimony that I cited in 2 ER 213 to 214 from Mr. Warmanhoven explains that, in fact, it didn't have anything about costs. So even those PowerPoints weren't enough to even go forward with an intention, a decision to confer these benefits or, never mind, create a plan. And the law is crystal clear that an intention to create a plan is not enough. Donovan itself says that, as well as this court's cases discussing Donovan. An intention to create a plan is not enough to bring it within ERISA. A decision to create a plan isn't enough. We need much more than that. And this court's decision in Golden Gate Restaurant Association, in fact, held that the Donovan criteria, while necessary, are not sufficient. So at what point was a plan created? At what point? When the insurer, which was designated to be Cigna in the PowerPoints for the original setup, issued the certificates. We have a plan document. We have a decision carried into effect. So what's that date? Could you just give me a date? When did that happen? Because we have a series of certificates, of course. Certainly. May 1, 2005, Your Honor. And the Cigna certificate, the key provisions are found at 4ER770, 721. Yeah, 770 to 771 are the crucial pages of the Cigna certificate issued in 2005. But our briefing has all the dates and citations. Are you familiar with the Pritchard case? Your Honor, I have to confess I haven't prepared that one of the dozens of others that I did prepare. No worries. I just wondered. Okay, that's fine. Thank you. No problem. I want to spend a few minutes on the breach of fiduciary duty claim. The essence of the claim, which I think is important to distill, Mr. Wormenhoven alleged that NetApp's breach consisted of misleading him about the benefits to be provided. But the only ground argued in his opening brief for reversal on this claim was nondisclosure. Not fraud, not affirmative misrepresentations, but simply nondisclosure. That is the theory that he contended ought to be a basis for reversing summary judgment. So we think that's a waiver of anything else. But in all events, the district court summarized the evidence was one-sided that NetApp did sincerely intend to provide lifetime medical benefits to retirees, saying so in its SEC filings, and in fact providing the benefits to qualifying retirees for 11 years. From versus equitable life cited in the summary judgment order explains why a present truthful intention to confer the benefits cannot retrospectively be converted into a misrepresentation. Can I interrupt? On page 21 of the district court's opinion, the district court cited the From case from my home circuit. And is that the law in the Ninth Circuit, that there's no breach of fiduciary duty unless the employer set out to deceive or disadvantage plan participants, that there's some sort of intent requirement? No, I wouldn't go that far, Your Honor. I don't know of a case that precludes a theory as a matter of law that some egregious nondisclosure wouldn't be enough. But this record forecloses that conclusion as a matter of law, because no circuit law permits an executive to ignore information that he knows exists, knows is important, and chooses not to read. In fact, this court routinely enforces ERISA requirements and plan terms to the detriment of far less sophisticated plaintiffs, as it did in Pashata, Sinelli, and the cases they cite. Is there anything in the PowerPoint that refers to the certificates? The PowerPoint refers to the Cigna policy, and Mr. Warmanhoven got a summary of the Cigna policy, which did refer to the certificates. Can you tell me where in the record I would read to show how they were presented, were they presented simultaneously, or did he just have access to them, or where do I look at? Because it seems to me for the second claim, those details matter. Absolutely. So I have those sites, for your honor. The five-page summary was produced by Mr. Warmanhoven. You can refer to 2 ER 235 to 240. Okay. That copy happens to be hard to read, just for whatever reasons. That's not how he got it, but in the record, that copy is hard to read. So a clearer copy can be found at 3 ER 524. And in fact, the PowerPoints themselves do refer to the attached summary. It's just not included in the record that he produced. The slides that came afterward, or whether it was given out at the meeting, but the PowerPoints explicitly mention a Cigna summary. I need help with that. I don't see that. Forgive me, Judge Feinerman. Is that in our record, a PowerPoint slide that includes the reference to the policy, or are you saying that's not included in our record? Oh, no, it's there. So let's look at 15 ER 3639. I can do that while you're answering Judge Feinerman's question. I just want to make sure that I've got it in the record. Go right ahead. Sure. Top of the slide, Your Honor. Judge Feinerman's question. Sure. Are you saying that there's no breach of fiduciary duty if the employer says something that's not correct? And the employee, if the employee looks at the right document, can figure out that what the employer said was wrong? The employer, first of all, we never said anything that wasn't correct. We certainly never said that, oh, we're committing never to exercise our default right to termination under the ERISA law. That's not, I mean, there is no direct misrepresentation. He's never even argued that. So what I'm contending, Your Honor, is that he admitted he understood the PowerPoint was only a summary of some of the plan's features. He admitted he knew it wasn't the entire thing that he had to look at. And I refer you to 2ER214. He admitted he understood NetApp would be ensuring this benefit through Cigna, 2ER213. He admitted he knew the specifics of the plan features were described more fully in other documents, 2ER214, right? He admitted that NetApp gave him a five-page summary of the Cigna coverage, which we were just discussing with Judge Kristen, which itself said, go look at the certificates for limitations on coverage. So what does unlimited lifetime maximum benefit mean? Ah, so that means, to be specific, that there isn't a limit on the amount of coverage we will pay any person. Their Cigna will pay any person for whatever damage or disease or injury might occur to you. But the question goes to the lifetime part. Sure. Not the unlimited part. No, I mean, there's no debate that NetApp originally intended to confer lifetime coverage. But there's likewise no debate that we never relinquished our right under ERISA to terminate this plan if business judgment required it. So that's the contract. I mean, that's the ERISA claim, but in terms of benefits due under ERISA. But I am more concerned. I'll tell you, I'm more concerned about the second claim, the breach. I'm looking at the PowerPoint, trying to find ambiguity. Do you want to speak to that? Well, sure. First of all, there's an admission under oath from Mr. Warmanhoven that there are no ambiguous terms in the plan, right? That's 3 ER 499 to 500. He's arguing the PowerPoint is the plan, and he's arguing that the PowerPoint is absolutely unambiguous because it says lifetime benefits. I'm summarizing, but as you know, that's his argument. So would you want to respond, take your best shot at that issue? Sure. There's simply no entitlement to rely on PowerPoint slides when a plan has issued an ERISA governed document that controls the terms, right? That is the very core tenet of ERISA, that the written plan controls. And these slides do not satisfy criteria for the written plan under either. Frankly, under the statute, we argue 1102 or under Donovan, the test that he argues. It's a little bit silly to suggest that only the definition section of 1002 controls. You know, what are the requirements for a plan when it's actually 1102 that says requirements for a plan? The district judge was, I think, rightly surprised about that contention. So the PowerPoints were superseded by the issuance of the certificates. They were never any more than a proposal by staff to the executives and didn't even crystallize into anything resembling a plan until much later, which under even Donovan, the case he relies on, an intention, even a decision to offer benefits is not a plan by itself. You need far more than these PowerPoints provided. They don't even meet the Donovan test, Your Honor. Never mind 1102, which is the actual test. What's the date that he received the PowerPoint packet that applies to his case? So he received two versions, one version of the PowerPoint in 2005. He saw it in April. It was issued in April. It took effect May 1, 2005. So you just told me that May 1 is the date that a plan was existed, that it was formed as of that date. Yes, it took longer, but it was retro. It was effective as of May 1. OK, thank you. Sure. So that's that one is the only one that he got. And then upon approaching retirement, he was given the certificates themselves. I'm not frankly sure why counsel is referring to any other copies of the PowerPoints because there's no evidence his client ever saw them. They're just even even upon departure from the company, didn't get another set of the PowerPoint. No, no. The March 2014 PowerPoint, which is at 3377. I I'm not sure what your honor's question is. Well, Mr. Warman, I've never received that. He was there's no evidence he was ever sent that. But frankly, even if he was. It doesn't change what the plan document is. Right. I'm flipping back to the to the second claim. OK. But it was sheer duty. Yep. Because I'm 3378. Mm hmm. It says very plainly plan provides medical benefits for the retirees lifetime. OK, so if he got that. Wouldn't that be a statement from the employer? That is a misrepresentation of what the plan in the certificates. Let's say I agree with you on the certificates. Certificates say no, because at the again, NetApp always honestly and sincerely intended that even as of the date that your honor's talking about the plan. But now we're going back to the from case where you agreed with me that from isn't the law in the Ninth Circuit because there doesn't have to be an intent to deceive. Oh, no. If I if I conveyed that, let me clarify. From it was correctly adopted by the trial judge and ought to be adopted by this panel because it says that you can't go back to an honest assertion of intent at the time it was made and convert it into a misrepresentation simply because a business judgment to go a different direction was later made. Right. So do you mean adopted? We should adopt this and we should change Ninth Circuit law? Because judge Feynman's original question was, is that the law in the Ninth Circuit? And I don't know that. I don't know. I don't understand your answer. OK, the Ninth Circuit does not have a case directly addressing the issue in from. Right. So when you just said the Ninth Circuit should adopt from you meant we should change our law. Is that right? Well, as opposed to suggesting that we should follow from because that's binding authority, I just it's not a trick question. I just want to be clear that that you're not saying something because the question really was, is does that apply here? And is it binding? And I think your answer now is, oh, no, no, no. It's a Seventh Circuit case, but it's an extremely persuasive decision by Judge Easterbrook that I commend to this court. I think it's it's highly persuasive on the question of and frankly, it's just common sense. I mean, how is it possible that that even though I not only sincerely meant what I said 12 years ago, but I acted upon it. I published I filed things with the SEC saying this is what we're going to do. I paid to do I paid beneficiaries. I net up for years in accordance with this plan. But but came to a different business judgment as Arisa entitles us to do under the default rule of nonvesting. Right. That is the law under any number of cases from this court in the Supreme Court. That does not retroactively make my earlier assertions false. So you are wildly over time. And I just want to make sure we have any other questions here. I just have one. I'm so sorry. And I'm not at all. Go right ahead from where I'm sitting on the 21st floor of the Dirksen building. I hesitate to call the question an opinion by Judge Easterbrook. But I do have to say, wouldn't the Matthews case from the Ninth Circuit? Wouldn't we have to overrule Matthews in order to adopt from Matthews, which rejected the proposition that under Arisa, the plaintiff must establish knowledge or belief on the part of the defendant that the representation is false? Your Honor, I think Matthews is simply too distinct from this case to be concerned about. In that case, the local manager, quote, actively misinformed, unquote, three plaintiffs about the availability of future retirement benefits. All right. That's it. 1184 to 1187. It's this discussion about. So briefly, please. You are eight and a half minutes over time. So briefly trying to help the court, Your Honor. I just think Matthews is distinct. It concerns active misinformation. And this opening brief contends that there was a nondisclosure and nothing more. Thank you. We'll hear from opposing counsel and we'll put a couple of extra minutes on the clock for you. We took opposing counsel significantly over time. She was very patient answering our questions. But we have a long calendar today. So go ahead. With all due respect to Ms. Hitler, virtually everything she said is either contrary to the record or contrary to the law. We'll start with the case. I want to read to you the key language from the show. District Court concluded that the appellants could not justify to rely on the language contained in the insurance booklets, creating a non-modifiable benefit because the booklets contain the following disclaimer. The booklets. This booklet describes the provisions of the group insurance program contained in the contract between the company and the insurance carrier. The contract shall be the controlling document. The same thing happened in Sinelli. The same thing happened in Mole. It was a subrogation issue. There is a clear connection between the plan, the benefits and the insurance policy that is going to administer the benefits where the plan says, by the way, the policy. That's what governs. So if there's termination, termination language in there, we can get rid of it. It is just Christian was right. It was the 2014 PowerPoint that we believe is most applicable because that's the time that he retired. In a way, it doesn't make much difference because they were all virtually identical. They were given to you. It would matter if you didn't if your client didn't see it. And opposing counsel just said that your client didn't receive the 2014 PowerPoint. Do you have a response to that quickly? You received all of him. He was the CEO until 2014 and then obviously became eligible at about 2013, about a year before he retired. Do we have anything in the record indicating that we saved all of them? I think so. I don't have the citation here to his declaration, but he said the reference to the fact that there's other documentation out there is virtually meaningless. But the key reason that I brought up in my opening argument and that Mr. Hepler didn't respond to the certificates cannot in any way be considered part of the plan when they refer to a different document. They don't refer to the executive medical retirement plan. They refer to something called the group welfare benefit plan. For all we know, that's the employee benefit plan that involves thousands of people that work for NetApp. It does not specifically reference the executive employee medical plan. Plus, it doesn't have any of the other elements of a plan requirement. Let's go back to the PowerPoint. And I understand your honors concerns that it should. Is this a summary plan description or not? That's obviously a term of honor. But let's go back to the basic statute. What do you have to have to have an ERISA plan? Blouse said it for the Ninth Circuit. Scott says it for the Ninth Circuit. Scott later got distinguished because it dealt with severance plans. We now know a severance plan is not an ERISA plan. A medical benefit plan is surely an ERISA plan. What do you need? You need everything that's in the PowerPoint. It provides lifetime benefits for the retiree's employee. Ms. Hepler said, oh, there's no indication of how this is going to be funded. On page two of the 2014, no retiree contributions required. She talks about, well, there was some reference to benefits given by the insurance company. That's right. On page four, it says medical plan design. And then it basically shows the list of the benefits you get. So, in a way, it's just they're circling their tails. The certificates obviously applied to the employee plan. The current employees. It had nothing to do with retirees. Other than being, this is the same benefits that the employees get. That's what you'll get when you retire for your lifetime. Obviously, subservient to the Medicare becoming the primary. So, I think I've said all I can with respect to plan formation. The fact that all of the circuit cases in which they found there was an insufficient basis to find a plan, dealt with situations where the language was clearly incorporated into the plan document. And there is no reason under the law, look at Blau, look at Scott. The documentation of the plan there was not existing. We've asked you to look at the board case. The board was a ten circuit case. But it involved a clear written statement that retirees would have certain lifetime benefits. Later, the company said, no, our business plan has changed. We can't afford this anymore. Oh, by the way, look at the insurance policy that covered you. Look at the termination language. The board says, what are you talking about? There's no connection here. You made a separate independent obligation, which we say is an ERISA plan. It meets all the section three requirements. And there is no termination language in it. We had a lot of questions about the second cause of action, which maybe I gave too short a trip to. Bob, you're out of time, so I'd ask you to wrap up. Just take another minute or so to wrap up, please, sir. The statement, it was only nondisclosures, is not true. We incorporated all the allegations in the first claim, which had PowerPoint statements. That isn't a nondisclosure. That's a statement on the record. We talked about the SEC disclosures to the public. All of those said they were lifetime benefits. None of them said they're subject to us changing our mind later. Also good. Thank you both for your patience with our questions and for your helpful oral argument. We'll take this matter under advisement and move on to the next matter on the calendar.
judges: Christen, Feinerman, Bade